## UNITED STATES v. GLAZER.

### No. 27125(2).

United States District Court
E. D. Missouri, E. D.
Dec. 12, 1952.

See also, D.C., 14 F.R.D. 86.

George L. Robertson, U. S. Atty., Marvin C. Hopper, Asst. U. S. Atty. and Ted A. Bollinger, Asst. U. S. Atty., all of St. Louis, Mo., for plaintiff.

Morris A. Shenker, of St. Louis, Mo., for defendant.

HULEN, District Judge.

The defendant stands convicted on two counts of indictment charging him with willfully attempting to defeat and evade the payment of Federal income taxes by filing false tax returns for the years 1945 and 1946. Defendant's motions in arrest of judgment, for judgment of acquittal and for a new trial are now for ruling. The Government prosecuted the case on the net worth and expenditures method. The principal contentions of defendant in support of motion to nullify the jury verdict of guilty challenge the sufficiency of the evidence to make a submissible case, because "The Government failed to establish [1] a source of alleged reported income and [2] failed to establish a proper foundation for a reconstruction of income"—a definite starting point.

The defendant reported net income as follows:

| Year | Net Income | Income Tax Due |
|------|-----------|----------------|
| 1945 | $29,167.62 | $12,633.95 |
| 1946 | 40,861.71 | 16,359.36 |

According to the Government's accountant who investigated the defendant's returns for the years in suit, the correct net income and tax liability of the defendant is as follows:

| Year | Net Income | Income Tax Due |
|------|-----------|----------------|
| 1945 | $193,048.28 | $154,796.80 |
| 1946 | 123,297.47 | 74,242.21 |

The Government's calculations thus show unreported income as follows:

| Year | Unreported Income | Tax Due |
|------|-------------------|---------|
| 1945 | $163,880.66 | $142,162.85 |
| 1946 | 82,435.76 | 57,882.85 |

The Government's case is based principally upon the theory that proof of expenditures and increase in net worth of defendant is, under the circumstances of this case, proof that the defendant in each of the years involved had substantially more income than he reported.

The defendant came to this country as an immigrant in 1912, at the age of fifteen.[1] At that time he had no funds.

During the taxable years 1945 and 1946 the defendant owned half the stock in two packing companies, S. & E. Glazer Packing Co. and Albert Glauser, Inc. He held the office of treasurer in the S. & E. Glazer Packing Co. and the position of general manager in each of the companies. There was testimony that the packing companies engaged in sale of meat at over-ceiling prices during the years 1945 and 1946. As a source of income it is the Government's theory that defendant received substantial sums, paid as over-ceiling prices for meat.

Irving Strauss was engaged in the wholesale meat business in New York in 1948. He purchased "about twenty-nine carloads" of meat in the year 1945, the price being "about a hundred thousand dollars." He testified to paying a price in addition to the invoice price. Joseph Striebel was a salesman for the S. & E. Glazer Packing Company during 1945. His testimony is more specific than that of the witness Strauss:

"Q. Well, meat was purchased by your customers? A. That is right.

"Q. And it was invoiced to the customer? A. That is right.

"Q. And there was a price on the invoice? A. Yes, sir.

---

1. Defendant gave a sworn statement to the Revenue Agent on July 21, 1945, after being properly and fully advised of his rights.

560

"Q. And how was that price paid for by those customers? A. By check.

"Q. All right. Now were there any payments in addition thereto? A. Yes, sir.

\* \* \* \* \* \*

"Q. What were those payments in addition? A. Well, in 1945 I couldn't tell you exactly, but they started out with paying four or five cents.

"The Court: Four or five cents, did you say? A. Over. That started first that we charged them four or five cents over.

"The Court: Four or five cents over on what? A pound? A. Yes.

"The Court: Over what? A. Over the O.P.A. prices.

"Q. And how did you make those four-or-five-cent collections from the customers? A. By cash.

\* \* \* \* \* \*

"Q. How many customers did you have? A. Well, at that time only took care of about six or seven.

"The Court: You are referring to time, what time? A. 1945.

"The Court: Go ahead.

"Q. And how did you handle that cash? Did you receive any instructions from your employer as to how to handle it?

\* \* \* \* \* \*

"The Court: Did you receive any instructions from the defendant, Ely Glazer? A. Well, I would say it was from him, yes; it would be either he or his brother, that the basis would be, costs so much, and they expected that much money back for it.

"Q. Now I will ask you whom you delivered this cash to. A. Well, it is hard to say. The cash would be brought in and counted on a desk.

"Q. In whose presence? A. Well, it would be Mr. Ely's presence or his brother's presence, or both of them.

"Q. Can you state to the Court and the jury how much, if you know, those collections were? A. That would be hard.

\* \* \* \* \* \*

"A. That would be hard to set a certain amount.

"Q. Can you give us your best estimate as to the amount? A. Well—

\* \* \* \* \* \*

"A. It might amount to two-three hundred—maybe more.

"Q. How often?

"The Court: Three hundred what? A. Dollars.

"Q. And you say you collected that and brought it to the packing house? A. Yes, sir.

"Q. And it was delivered in Mr. Glazer's presence? A. Yes.

\* \* \* \* \* \*

"Q. You say you started out so many cents a pound? A. Yes, sir.

"Q. What was that amount, you say? A. It started out four or five cents a pound.

"Q. You say started out. What year do you mean? A. Well, that started out maybe in 1943.

"Q. Well, did you keep that same rate, or did the rate go up or down? A. The rate went up.

"Q. Did you collect the overcharge on all sales? A. On all beef sales, yes sir. That is, the carcasses."

Anna Worman was bookkeeper for Albert Glauser, Inc., and as a Government witness testified that during the years 1945 and 1946 at various times the defendant brought cash to her in the company office and in exchange for the cash received a company check. On other occasions defendant brought both currency and checks, other than the company check, and exchanged or invested them in company checks. The bookkeeper made an entry on the deposit slips of the funds received from the defendant in this way—"Exchange with Ely Glazer." [Gov't Ex. 73I(4) to 73Y (9).] These transactions apparently commenced about February 1945 and ran to October 1946. O.P.A. ceiling prices on meat were removed by Executive Order in October, 1946. The transaction designated as "Exchange with Ely Glazer" were in substantial amounts. There was $7,465 in currency, represented by the first exhibit

[73I(4)], on February 19, 1945. Two days later [Exhibit 73J(4)] there was $15,000 in cash exchanged for company check by the defendant. One of the largest exchange transactions was $17,000 [Exhibit 73U(9)], exchanged by the defendant for the company check on August 31, 1946.

Defendant's stock holdings in Albert Glauser, Inc. during the years in question was $2,250, and in S. & E. Glazer Packing Co. it was $30,954.75.

When the defendant was asked by the Revenue Agent, on July 21, 1945, to explain the "exchange checks", his answer was— "These checks would be checks which I cashed for Albert Glauser, Inc."

The Government's auditor testified the records of Albert Glauser, Inc. showed that defendant, as of December 31, 1945, held checks of this character "uncashed" in the sum of $119,900. These checks had been accumulated by the defendant during 1945. As of December 31, 1946, defendant's holdings in such exchange transactions shown on the books of Albert Glauser, Inc. as "notes or accounts receivable" was $140,-834.15.

· Albert Glauser, Inc. records show as of December 31, 1944 there was $94,275.00 due from the corporation to defendant under the same heading. In examination of defendant on July 21, 1945, he was asked the question—"How much money do you have loaned to Albert Glauser, Incorporated, at this time?" His answer, without access to the books, was—"I think it runs in the neighborhood of $94,000.00."

Defendant in his statement of July 21, 1945, denied that either of the meat corporations ever sold above ceiling prices. An examination of the books of Albert Glauser, Inc. showed that the assets of defendant, represented by purchase of checks of Albert Glauser, Inc., was substantially paid off by Albert Glauser, Inc. subsequent to 1946.

At the beginning of the examination upon which this prosecution is based, the Revenue Agent requested defendant to produce his books and records of his individual income and expenditures for the years under question. The only records received were some cancelled checks and bank statements. The same agent testified to making a detailed audit and examination of cash advanced by the defendant to the corporation, afterwards revealed to be by the exchange method, together with an audit and analysis of defendant's personal bank accounts, and that a memorandum representing cash advances and deposits totaling large sums was submitted to defendant's attorney for explanation. No explanation was ever given. Defendant did not testify in this case.

In defendant's statement of July 21, 1945, defendant told Revenue Agents that he had four safe deposit boxes in three different banks and one at his home, and that he kept large amounts of cash in these safe deposit boxes—as much as $100,000 at a time, and that when the statement was made he had currency in the safe deposit boxes. Defendant had been questioned by another Revenue Agent some time prior to his July 21, 1945, statement in regard to cash in his safe deposit boxes. In the July 21, 1945 statement defendant stated that he had taken no cash out of his boxes after the first conversation and admitted he made the statement in the first interview—"I told him I did not have any [money] right now in the safe deposit box." In making some loans the defendant used cashier's checks.

The defendant was 47 years of age in 1945. He had been in this country at that time 33 years. Defendant's income tax returns, commencing with the year 1925, were analyzed. It was found that from 1920 to 1924 no returns were filed. For these years the defendant was given the benefit of maximum earnings not to require a return. It appears that in all cases the defendant was given the benefit of the doubt to increase his net worth. By this method, after deducting estimated living expenses defendant had a net worth, on December 31, 1944, of $70,408.85.

In defendant's statement on July 21, 1945, he stated he had never inherited any money from anyone; that his wife had no separate income and owned no property of any kind except qualifying shares in Glazer Packing Company; that defendant's children own nothing of consequence. Defend-

ant stated that the only income he had was salary of $30.00 a month from Glazer Packing Company for use of his car, and a salary of $150.00 to $200.00 a week from one packing company and $50.00 a week from the other. Asked as to ownership of corporate stocks defendant stated ownership of stock in Chicago & Rock Island Railroad Company, ownership of Government bonds. He reported bank accounts in one bank.

Defendant was given credit for all claimed assets. In addition Government agents found a checking account in two banks as of December 31, 1944; that the defendant increased his holdings of United States Treasury bonds from $15,000.00 on December 31, 1944, to $185,846.07 on December 31, 1946; that the defendant increased his holdings of corporate stocks from $7,795.03 on December 31, 1944, to $85,228.70 on December 31, 1946; and required notes, some secured by deeds of trust, during the two years in question in the amount of $70,000.

Using the net worth method, based on records produced in court, the Government's witness prepared and offered Exhibit No. 114, showing an increase in net worth of defendant for the year 1945 of $180,589.61, and for the year 1946 of $113,028.99. Defendant's claimed assets, and other assets omitted by defendant, showed a net worth as of December 31, 1944 of $237,408.35.

The Government had the burden of showing beyond reasonable doubt that there was a failure to report taxable income in a substantial sum for the two years of 1945 and 1946, and that such failure was an attempt to defeat and evade the payment of Federal income taxes by filing a false tax return. The Government is not required to make a perfect case or prove to a mathematical certainty the income of the defendant which was unreported in his income tax returns.

The Court is here presented with a case where the defendant has failed to keep, or if kept failed to produce records of his financial transactions which ran into substantial sums; a defendant who kept a number of safety deposit boxes and kept large sums of cash in the boxes; a defendant who engaged in dealing in large sums of currency obtained from some source; a defendant who refused to co-operate with the Government and although given an opportunity to explain a source of his income as shown by increase in his net worth and purchase of securities, failed to offer any explanation.

The Government's case was largely circumstantial but we think it sufficient to furnish a substantial basis for the jury reasonably to infer that the defendant had a source of income and that a proper foundation for reconstruction of income on the net worth basis was made. United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546; Gleckman v. United States, 8 Cir., 80 F.2d 394; Schuermann v. United States, 8 Cir., 174 F.2d 397; United States v. Chapman, 7 Cir., 168 F.2d 997; Jelaza v. United States, 4 Cir., 179 F.2d 202; Leeby v. United States, 8 Cir., 192 F.2d 331; United States v. Skidmore, 7 Cir., 123 F.2d 604.

We cannot agree with the defendant that the evidence is as consistent with a reasonable hypothesis of innocence as with guilt. We think, taking this record as a whole, that the evidence points unmistakably to the defendant's guilt of the charges contained in the indictment. The evidence is ample to sustain a conclusion by the jury that the exchange items by which defendant purchased checks of the Albert Glauser, Inc. did not go through the company books and were not reported on the corporate income tax return. The over-ceiling price on meat was not carried on the invoices. Defendant stated in his July 21, 1945 statement that the corporation received no income from over-ceiling prices on sale of meat.

We can find no prejudice to defendant in Government Exhibit 114. True it was a large exhibit and permitted all of the jurors to view the calculations of the Government witnesses at one time. The exhibit also permitted the witness while testifying to refer to his figures on the exhibit and they were observable by jurors all at one time, as well as counsel and the

Judge. The same result might have been obtained by submitting to everyone present and concerned in the trial a small sized exhibit containing the same information. It would have been difficult to follow the witnesses by the latter method.

■ Defendant now excepts to the term "unreported income" appearing on the chart, Exhibit 114. We recall no such objection at the time the chart was offered nor at any time during its use. The term "unreported income" was used throughout the trial and we do not think any prejudice resulted to the defendant by its use on the chart.

■ Defendant's assignment that the charge to the jury is prejudicial because it stated that the jury was instructed, at defendant's request, with respect to defendant's failure to testify. The law is so paradoxical on this instruction, it being an error to give it without a request and error to refuse to give it if requested, it is our opinion that the charge should plainly show that it is given at the request of the defendant, to obviate any question of error. Since the jury was told that the charge should be considered as a whole, and not separately, this part of the charge could not have been minimized by the Court's observation that it was given at defendant's request.

Finding no basis for the assignments of the defendant in support of its motions, the motions will be overruled.